# EXHIBIT A
# Part 1

**STATE OF NORTH CAROLINA**

**MECKLENBURG COUNTY**

**IN THE GENERAL COURT OF JUSTICE**
**SUPERIOR COURT DIVISION**
13-CVS-_____

---

TOM BORTHWICK, derivatively on
behalf of SWISHER HYGIENE, INC.,

       Plaintiff,

       v.

STEVEN R. BERRARD, MICHAEL J.
KIPP, DAVID O. BRALEY, JOHN ELLIS
BUSH, HARRIS W. HUDSON, H.
WAYNE HUIZENGA, WILLIAM D.
PRUITT, DAVID PRUSSKY, RICHARD
L. HANDLEY and MICHAEL SERRUYA,

       Defendants,

and

SWISHER HYGIENE, INC.,

       Nominal Defendant.

**VERIFIED SHAREHOLDER DERIVATIVE**
**COMPLAINT**

**DEMAND FOR JURY TRIAL**

---

By and through his undersigned counsel, Plaintiff Tom Borthwick ("Plaintiff") brings this shareholder derivative action on behalf of Swisher Hygiene, Inc. ("Swisher" or the "Company") and against certain officers and directors of the Company for breaches of fiduciary duties, gross mismanagement, abuse of control, waste of corporate assets, and aiding and abetting thereof. Plaintiff makes these allegations upon personal knowledge as to those allegations concerning Plaintiff and, as to all other matters, upon information and belief derived from the investigation of counsel, which included, without limitation: a) review and analysis of public filings made by Swisher and other related parties and non-parties with the U.S. Securities and Exchange Commission ("SEC"); b) review and analysis of press releases and other publications

disseminated by certain of the Defendants and other related non-parties; c) review of news articles, shareholder communications, postings on Swisher's website concerning the Company's public statements; d) pleadings, papers and any documents filed with and publicly available from the related pending securities class actions and e) review of other publicly available information concerning Swisher and the Individual Defendants (defined herein).

## I.    INTRODUCTION

1.    Swisher provides commercial hygiene and sanitation products and services in North America and internationally through a global network of company-owned operations, franchises, and licensees.

2.    As detailed below, Swisher's Board of Directors (the "Board") embarked on a plan of rapid acquisitions but failed to implement appropriate internal controls at Swisher. This lack of internal controls allowed the Company to falsely account for business acquisitions and to violate accounting standards by improper calculations that caused the Company to overstate its income. The Individual Defendants caused or allowed Swisher to issue materially false and misleading statements concerning the Company's financial condition and business prospects, including false financial disclosures in filings with the SEC.

3.    In particular, from May 16, 2011, to the present (the "Relevant Period"), the Individual Defendants made and/or failed to correct materially false and misleading statements concerning the Company's current and future business and financial condition. By overstating the Company's revenues and understating the Company's expenses and losses, the Individual Defendants artificially caused Swisher's stock price to rise based on positive financial reports.

4.    However, as the truth about the Swisher's financial prospects and condition emerged, the Company's share price plunged. On March 28, 2012, Swisher disclosed that its

previously issued financial results for the first three quarters of fiscal 2011 should no longer be relied upon.

5.    On this news, shares of Swisher stock declined $0.29 per share on March 28, 2012, and further declined $0.33 per share on March 29, 2012, to close at $2.43 per share, a loss of over 20% in two days.

6.    Throughout 2012, the Individual Defendants (i) failed to file corrected 2011 financial reports and (ii) were unable to meet the filing deadlines for the Company's required 2012 reports with the SEC, causing the Company to fall out of compliance with the listing requirements for The NASDAQ Global Market stock exchange ("NASDAQ"), in a continuing breach of their fiduciary duties. Until June 11, 2013, the Company remained out of compliance with NASDAQ listing rules and was at risk of delisting.

7.    Meanwhile, the Company's stock price has continued to decline, closing at $0.79 per share on June 25, 2013, a loss of over 74% of the value of Swisher shares since the day that the false and misleading financial statements were first revealed.

8.    The Individual Defendants' illegal actions and course of conduct have subjected Swisher to a consolidated class action lawsuit for violations of the federal securities laws. As a result, Swisher has expended, and will continue to expend, significant sums of money to rectify the Individual Defendants' wrongdoing.

9.    Plaintiff therefore brings this shareholder derivative action (i) to recover for the Company those losses caused by the Individual Defendants' breaches of fiduciary duties, gross mismanagement, abuse of control, waste of corporate assets, and aiding and abetting thereof; (ii) to seek reforms to the Company's corporate governance designed to prevent these actions in the

3

future; and (iii) because the Company's Board has refused to take any corrective action despite Plaintiff's demand.

## II.  JURISDICTION AND VENUE

10.  This Court has jurisdiction over the subject matter of this action pursuant to N. C. Gen. Stat. § 55-7-40.

11.  This Court has personal jurisdiction over the parties to this action pursuant to N. C. Gen. Stat. § 1-75.4.

12.  Venue is proper in this Court pursuant to N. C. Gen. Stat. § 1-79 because the Company maintains its principal place of business in this county.

## III.  THE PARTIES

13.  Plaintiff Tom Borthwick is a citizen of Canada. He purchased Swisher common stock in January 2012, and has continuously held his stock ever since.

14.  Nominal Defendant Swisher Hygiene, Inc. is a Delaware corporation with its principal executive offices in Charlotte, North Carolina.

15.  Defendant Steven R. Berrard ("Berrard") was President and Chief Executive Officer ("CEO") of the Company from 2004 until August 2012. Berrard also served as interim CFO from May 2012 until June 2012, and has been a director from 2004 until the present.

16.  Defendant Michael J. Kipp ("Kipp") was Senior Vice President and Chief Financial Officer ("CFO") of the Company from May 2011 until his employment was terminated in May 2012.

17.  Defendant David O. Braley ("Braley") has served as a director of Swisher since November 2010.

4

18.    Defendant John Ellis ("Jeb") Bush ("Bush") served as a director of Swisher from November 2010 until June 2013.

19.    Defendant Richard L. Handley ("Handley") has served as a director of Swisher since December 2012.

20.    Defendant Harris W. Hudson ("Hudson") has served as a director of Swisher since January 2011.

21.    Defendant H. Wayne Huizenga ("Huizenga") served as a director and Chairman of the Board of Swisher from November 2010 until June 2013.

22.    Defendant William D. Pruitt ("Pruitt") has served as a director of Swisher since January 2011.

23.    Defendant David Prussky ("Prussky") has served as a director of Swisher since January 2011.

24.    Defendant William Serruya ("Serruya") has served as a director of Swisher since 2010.

25.    The defendants named in ¶¶15-24 are referred to herein as the "Individual Defendants."

## IV.    FACTUAL ALLEGATIONS

### A.    Background

26.    Swisher provides commercial hygiene and sanitation products and services in North America and internationally through a global network of company-owned operations, franchises, and licensees.

27.    Defendants Berrard and Huizenga first invested in Swisher in 2004, paying $8.1 million to the Company's founder, Patrick Swisher, for a 50.1% stake in Swisher International,

5

Inc. In August 2010, Swisher International, Inc. and CoolBrands International Inc. announced a merger that would result in the formation of Swisher Hygiene, Inc., which closed in November 2010. As a result of the merger, the Company went public on the Toronto Stock Exchange. In February 2011, the Company also began trading on NASDAQ under the ticker symbol "SWSH."

28.    As reported by Business Wire on August 18, 2010:

> Swisher represents the latest partnership created by Mr. Huizenga and Mr. Berrard seeking to build a national business services brand that capitalizes on growing commercial hygiene market needs, significant expansion opportunities and a scalable delivery platform. Mr. Huizenga found his earliest success with the public offering of Fortune 500 company Waste Management, Inc. in 1972. Over the past 25 years, the two entrepreneurs have built a number of successful, highly-recognized Fortune 500 enterprises, including Blockbuster Entertainment, where they created the industry leader and sold the business for US$8.4 billion in 1994, AutoNation, where they created the industry leader and named "Fastest Growing Company in America" by Fortune magazine in 1998, and Republic Services, where they developed a leading provider of services in the domestic, non-hazardous solid waste industry.

29.    Defendants Berrard and Huizenga embarked on their usual "roll-up" strategy with Swisher, with a plan to rapidly acquire competing smaller companies to quickly build market share and reduce competitors. In 2011, the Company averaged approximately one acquisition a week. The Company's stock price reached record highs, closing at $10.50 on April 18, 2011.

**B.    False and Misleading Statements**

30.    During the Relevant Period, certain defendants made materially false and misleading statements concerning the Company's current and future business and financial condition.

31.    On May 16, 2011, the Company reported its financial results for its fiscal 2011 first quarter ending March 31, 2011. In addition to reporting strong sales and growth, the Individual Defendants caused the Company to report the following highlights in a press release issued the same day:

6

- Total revenue for the three months ended March 31, 2011 increased by 86% to $27.4 million compared to $14.7 million for the same period in 2010, led by an 89% increase in products revenue and a 139% increase in services revenue. Total revenue for the first quarter 2011 was up 55% sequentially from the fourth quarter of 2010. Excluding the impact of acquisitions, total revenue increased 15% from the same period of the prior year.

- Announced its outlook at annual meeting of $200 million in revenue for full year 2011, with current annualized Run-Rate Revenue in excess of $230 million.

- Raised over $195 million of equity in private placements with well-known and respected U.S. and Canadian institutions, and entered into a senior secured revolving credit facility with Wells Fargo Bank, N.A. providing up to $100 million of borrowing capacity. As of April 30, 2011, Swisher Hygiene had over $165 million in cash on its balance sheet.

- Completed nine acquisitions of hygiene and chemical companies and four acquisitions of franchises in the first quarter of 2011.

- In March 2011, acquired Choice Environmental Services, Inc., a Florida-based residential and commercial solid waste services company.

- In May 2011, acquired ProClean of Arizona, Inc. and Mt. Hood Solutions, the leading independent chemical providers in the Southwest U.S. and Northwest U.S., respectively.

- Commenced trading on the NASDAQ Global Market.

32.     Further, Defendant Berrard stated in the May 16, 2011 press release that:

Our first quarter 2011 results are evidence of the opening stages of our strategy of rapid expansion through acquisitions and organic growth with an 86% growth in revenue from the same prior-year period, and a 55% sequential increase in revenue compared to our fourth quarter of 2010. This is just the beginning of the increase in revenue that we anticipate reporting over the next few quarters and we believe the second half of the year should more accurately reflect how well our strategy is working in terms of revenue growth, margin expansion and leveraged operating costs. Our company will continue to use its capital wisely in order to maintain and extend its growth strategy going forward.

7

33.     The Quarterly Report on Form 10-Q filed with the SEC on May 16, 2011, was signed by Defendants Berrard and Kipp and also contained certifications required under the Sarbanes-Oxley Act of 2002, signed by Defendants Berrard and Kipp, who certified:

    1.      I have reviewed this quarterly report on Form 10-Q of Swisher Hygiene Inc.;

    2.      Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

    3.      Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

    4.      The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    a.      Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b.      Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c.      Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d.      Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the

8

registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.    The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a.    All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b.    Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

34.    On August 15, 2011, the Company reported its financial results for its fiscal 2011 second quarter ending June 30, 2011. In addition to reporting strong sales and growth, the Individual Defendants caused the Company to report the following highlights in a press release issued the same day:

- Total revenue for the three months ended June 30, 2011 increased by 241% to $51.7 million compared to $15.2 million for the same period in 2010, led by a 227% increase in product revenue and a 406% increase in service revenue. Excluding the impact of acquisitions, organic revenue for the quarter increased 22% from the same period in 2010.

- Total revenue for the second quarter 2011 was up 89% sequentially from the first quarter of 2011, and up 192% from the fourth quarter of 2010.

- Adjusted EBITDA was $3.0 million in the second quarter of 2011 versus an Adjusted EBITDA loss of $0.3 million for the prior-year period and compared to an Adjusted EBITDA loss of $1.0 million for the first quarter of 2011.

- Adjusted EBITDA margins in the second quarter of 2011 were 5.8%, compared to Adjusted EBITDA margins of -3.5% in the first quarter of 2011, -17.1% in the fourth quarter of 2010 and -2.2% in the prior-year period.

Case 3:13-cv-00449-GCM   Document 1-1   Filed 08/07/13   Page 10 of 41

- Raised revenue outlook for full year 2011 to $220 million, with annualized Run-Rate Revenue now in excess of $280 million.

- Closed on $76 million of additional equity capital in a private placement — the final tranche of a total of $191 million of equity raised in private placements, net of issuance costs, during the first half of 2011. As of June 30, 2011, Swisher Hygiene had over $112 million in cash on its balance sheet.

- Since March 31, 2011, Swisher Hygiene has completed 27 acquisitions, including 23 chemical, linen, and waste companies and four franchises.

35.    Defendant Berrard continued his upbeat comments in the August 15, 2011 press release, stating that:

> The second quarter of 2011 was more indicative of the revenue growth that we expect through our strategy of rapid expansion, and we were very pleased to report $3 million in positive Adjusted EBITDA, which is further evidence that we are moving in the right direction toward profitability. We have consistently grown our Adjusted EBITDA margins to 5.8% in the second quarter of 2011 from negative 17.1% in the fourth quarter of 2010. We have generated triple-digit revenue growth from the prior-year period, and an 89% sequential improvement in revenue from the first quarter of 2011. Importantly, our revenue growth was not just from acquisitions — we generated organic revenue growth of 22%, evidence that our cross-selling and new account initiatives are beginning to pay dividends. We completed 18 additional acquisitions during the quarter, which positions us for further rapid growth, and we were able to do so while still maintaining a cash balance of $112 million and retaining a significant amount of flexibility on our $100 million line of credit. We are very well positioned from a liquidity perspective in the second half of the year to not only continue our pace of acquisitions in key markets, but also to round out and supplement our service offering in markets where we already retain a significant presence, via tuck-in acquisitions that should provide for margin improvement at minimal cost.

36.    The Quarterly Report on Form 10-Q filed with the SEC on August 15, 2011 was signed by Defendants Berrard and Kipp and also contained certifications required under the Sarbanes-Oxley Act of 2002, signed by Defendants Berrard and Kipp, substantially similar to the certifications in ¶ 33 *supra*.

37.    On November 14, 2011, the Company reported its financial results for its fiscal 2011 third quarter ending September 30, 2011. In addition to reporting strong sales and growth,

10

the Individual Defendants caused the Company to report the following highlights in a press release issued the same day:

- Total revenue for the three months ended September 30, 2011 increased by 318% to $67.2 million compared to $16.1 million for the same period in 2010, led by a 353% increase in product revenue and a 438% increase in service revenue.

- Organic revenue growth for the quarter was 29% as compared with the same period in 2010.

- Total revenue for the third quarter 2011 was up 30% sequentially from the second quarter of 2011, and up 280% from the fourth quarter of 2010.

- Adjusted EBITDA for the third quarter 2011 was $5.3 million versus an Adjusted EBITDA loss of $1.1 million for the prior-year period and compared to Adjusted EBITDA of $3.0 million for the second quarter of 2011.

- Adjusted EBITDA margin in the third quarter of 2011 was 7.8%, compared to Adjusted EBITDA margins of 5.8% in the second quarter of 2011, -3.5% in the first quarter of 2011 and -6.7% in the third quarter of 2010.

- Revenue outlook for full year 2011 is expected to exceed $220 million, with annualized Run-Rate Revenue now in excess of $320 million.

- Since June 30, 2011, completed 28 acquisitions, including 26 chemical, linen, and dust control companies and two franchises.

38.     In the November 14, 2011 press release, Defendant Berrard stated that:

We continued to move in the right direction in the third quarter of 2011, with another quarter of triple-digit revenue growth, a 30% sequential improvement in revenue from the second quarter, as well as reporting over $5 million in positive Adjusted EBITDA. Our Adjusted EBITDA margin rose once again to 7.8% as we are realizing the efficiencies of our new regional operating structure and we are approaching our 2011-2012 target Adjusted EBITDA margin range of 10 to 18%. Organic revenue growth of 29% — a third consecutive quarter of double-digit organic growth — shows once again that our cross-selling and new account initiatives are working. We completed 22 additional acquisitions during the quarter and were still able to maintain over $200 million in liquidity available to fund additional acquisitions. As we move toward 2012, we will focus our business development efforts toward broadening our product offerings with an emphasis on our emerging linen and dust control businesses.

39.     The Quarterly Report on Form 10-Q filed with the SEC on November 14, 2011, was signed by Defendants Berrard and Kipp and also contained certifications required under the Sarbanes-Oxley Act of 2002, signed by Defendants Berrard and Kipp, substantially similar to the certifications in ¶ 33 *supra.*

## C.     The Truth is Revealed

40.     On March 28, 2012, the Individual Defendants caused the Company to issue a press release entitled "Swisher Hygiene Announces it Will File Form 12B-25 for Extension to File Its 2011 Annual Report on Form 10-K," announcing that the Company would be delayed in filing the Form 10-K which was due on March 30, 2012.  The press release further stated:

> The delay in filing is due to an ongoing internal review by Swisher Hygiene's Audit Committee primarily relating to possible adjustments to (1) the accounting for business acquisitions and (2) the calculation of the allowance of doubtful accounts receivable.   On March 21, 2012, the Board of Directors of Swisher Hygiene concluded that the Company's previously issued interim financial statements for the quarterly periods ended June 30, 2011 and September 30, 2011, and the other financial information in the Company's quarterly reports on Form 10-Q for the periods then ended, should no longer be relied upon. Subsequently, on March 27, 2012, the Audit Committee concluded that the Company's previously issued interim financial statements for the quarterly period ended March 31, 2011 should no longer be relied upon.  The Company refers to the interim financial statements and the other financial information described above as the "Prior Financial Information."
>
> As of today's date, the Audit Committee's review is not complete.  Nevertheless, the Audit Committee believes material adjustments to the Prior Financial Information may be required and the Company may need to file restatements of its first, second and third quarter financial statements.  While the amount of any such adjustments cannot be estimated with reasonable certainty at this time, to date, the Audit Committee has preliminarily identified an aggregate of approximately $3.6 million in increases to net loss before income taxes for the affected periods.
>
> The Company is working with its Audit Committee, the Audit Committee's outside experts and the Company's independent auditor to determine the full impact of these potential adjustments on the Prior Financial Information. However, until the review is complete and a final determination is made, the Company cannot provide further assurance regarding the complete impact of any adjustments on its results of operations for the affected periods, and the Company cannot provide assurance that the adjustments identified to date are representative

12

of the adjustments that will be required when the review is complete. Furthermore, the Company cannot assure that the review will not identify further adjustments that may be required.

"We want our shareholders to know that providing confidence and transparency in our financial statements is of paramount importance, and we are doing everything possible to ensure that this is a one-time only event," said Steven R. Berrard, Chief Executive Officer of Swisher Hygiene.

"We further want to note that the adjustments that are being discussed are non-cash in nature and we strongly believe that they will not diminish our financial position or strong capital structure," continued Mr. Berrard. "We have significant liquidity and financial flexibility, and we are still executing our plan to take advantage of the abundant opportunities our business model provides to make quality acquisitions and cross-sell to existing customers. Further, this announcement does not affect our view for 2012, as we still expect to see quarter-over-quarter revenue growth, double-digit organic revenue growth and double-digit growth in adjusted EBITDA."

The Company plans to complete its internal review and file its Annual Report on Form 10-K for the year ended December 31, 2011 as promptly as possible; however, the Company cannot provide assurance that it will be able to file its Form 10-K within the time period prescribed by Rule 12b-25.

41.     On the same date, the Company filed a report on Form 8-K with the SEC. The Form 8-K included the information in the press release, and additionally reported that:

The Audit Committee believes that non-cash adjustments made as a result of a correction in the calculation in allowance for doubtful accounts combined with potential changes to the Company's purchase accounting policies and interpretations of applicable accounting literature may materially increase reported net loss before income taxes for the first, second and third quarters of 2011. While the amount of any such adjustments cannot be estimated with reasonable certainty at this time, to date, the Audit Committee has preliminarily identified an aggregate of approximately $3.6 million in increases to net loss before income taxes for the affected periods. The Company is working with its Audit Committee, the Audit Committee's outside experts, and the Company's independent auditor to determine the full impact of these potential adjustments on the Prior Financial Information. However, until the review is complete and a final determination is made, the Company cannot provide you with further assurance regarding the complete impact of any adjustments on its results of operations for the affected periods, and the Company cannot assure you that the adjustments identified to date are representative of the adjustments that will be required when the review is complete. Furthermore, the Company cannot assure you that the review will not identify further adjustments that may be required.

13

The Audit Committee initiated its review after an informal inquiry by the Company regarding a former employee's concerns with certain of the Company's accounting policies. The Company first initiated the informal inquiry by requesting that both the Audit Committee and the Company's independent auditor look into the matters raised by the former employee. Following this informal inquiry, the Company's senior management and its independent auditor advised the Chairman of the Company's Audit Committee regarding the matters. Subsequently, the Audit Committee determined that an independent review of the matters presented by the former employee should be conducted. During the course of its independent review, and due in part to the significant number of acquisitions made by the Company, the Audit Committee determined it would be in the best interest of the Company and its stockholders to review the accounting entries relating to each of the 63 acquisitions made by the Company during the year ended December 31, 2011.

In connection with the Audit Committee's independent review, the Company is evaluating its internal control over financial reporting, and particularly controls relating to the estimated allowance for doubtful accounts calculation and controls relating to accounting for business acquisitions, to determine if any significant deficiencies or material weaknesses in such controls caused or contributed to any potential adjustments that may be required.

The Company's Audit Committee and Board of Directors have discussed the matters disclosed in this filing with the Company's independent auditors.

The Company plans to complete its internal review and file its Annual Report on Form 10-K for the year ended December 31, 2011 as promptly as possible. Although the Company will seek to extend the time required to file its Form 10-K in accordance with Rule 12b-25 under the Securities Exchange Act of 1934, as amended, there can be no assurance that the Company will be able to file its Form 10-K within the time period prescribed by Rule 12b-25.

42.    On this news, Swisher's stock price declined $0.29 per share on March 28, 2012, a loss of 9.51%. The following day, Swisher stock declined an additional $0.33 per share, 11.96%, to close at $2.43 per share on March 29, 2012.

43.    By April 2, 2012, Swisher's stock had declined to a closing price of just $2.25 per share, a loss of more than 25% from its value on March 27, 2012.

44.    The representations by the Individual Defendants concerning the Company's current business and financial condition, including its forecasted financial results, were each materially false and misleading when made, because the Individual Defendants failed to disclose

14

the following true facts which were known to the Individual Defendants and knowingly or recklessly disregarded:

(a)    Swisher's accounting for its many business acquisitions was improper and in violation of GAAP requirements;

(b)    the Company's internal controls were inadequate and unable to detect and prevent improper financial reporting; and

(c)    the Company's share price was artificially inflated due to the false and misleading statements of the Defendants.

45.    Rather than disclose these critical facts to investors, Defendants kept silent throughout the Relevant Period while the Company's stock traded at artificially inflated prices.

46.    On May 17, 2012, Swisher announced that its Audit Committee had "substantially completed the investigative portion of its internal review," and "based on the recommendations of the Audit Committee, determined that Michael Kipp, Swisher Hygiene's Senior Vice President and Chief Financial Officer, be separated from Swisher Hygiene effective immediately." The Board had also determined that two additional senior accounting personnel be separated from the Company effective immediately.

47.    On August 20, 2012, the Individual Defendants caused the Company to issue a press release announcing that Defendant Berrard was immediately stepping down as President and Chief Executive Officer of the company, but that Berrard would continue to serve as a member of the Board. At the same time, the Board had appointed Thomas Byrne, Swisher's then Executive Vice President, as interim President and Chief Executive Officer. The press release further stated that:

> "In order to facilitate completion of the 2011 audit process, and in order to better focus my energies on the strategic direction of Swisher Hygiene, I believe it is in the best interest of the company and its shareholders for me to step down as President and Chief Executive Officer," said Mr. Berrard. "I will miss leading the Swisher Hygiene team on a day-to-day basis, but I will continue to be involved in the ongoing strategic direction of the company as a member of the Board of Directors and as one of the company's largest shareholders."

Mr. Byrne commented, "The growth of Swisher Hygiene over the past few years would have been impossible without the hard work and dedication of Steve Berrard, and I know I speak for the entire Swisher Hygiene team in thanking him for leading the transformation of this company. I look forward to continuing to work with Steve and gaining the benefit of his insight as a member of the Board of Directors."

Mr. Byrne continued, "We are hoping to complete our ongoing accounting review expeditiously and file our 2011 financial statements as soon as possible, which will allow us to move Swisher Hygiene forward and continue our efforts to create value for our shareholders."

48.     Also on August 20, 2012, the Company issued a press release announcing that on August 15, 2012, Swisher "received a letter from NASDAQ indicating that it is not in compliance with the filing requirements for continued listing under NASDAQ Listing Rule 5250(c)(1) since its Form 10-Q for the quarter ended June 30, 2012 (the "June 30, 2012 Form 10-Q") will not be timely filed as a result of the company's continuing work on matters resulting from the previously disclosed audit committee investigation and procedures performed by the company's external auditors." The Company also noted that:

> As previously reported, Swisher Hygiene received non-compliance letters from NASDAQ on April 11, 2012 and May 15, 2012 in connection with its not timely filing its Form 10-K for the year ended December 31, 2011 (the "Form 10-K") and Form 10-Q for the quarter ended March 31, 2012 (the "March 31, 2012 Form 10-Q"), respectively. Pursuant to the August 15, 2012 letter from NASDAQ, Swisher Hygiene has until September 26, 2012 to file all delinquent filings, including the June 30, 2012 Form 10-Q, and is required to submit an update to its original plan to regain compliance with NASDAQ's filing requirements for continued listing by August 30, 2012. Swisher Hygiene intends to submit an update to its original plan by August 30, 2012. During the process of regaining compliance with NASDAQ, Swisher Hygiene expects that its common stock will continue trading on NASDAQ under the symbol "SWSH."

49.     Despite the assurances that the Individual Defendants caused the Company to make, the Company remained out of compliance with NASDAQ's filing requirements. On September 25, 2012, the Company issued a press release titled "Swisher Hygiene Inc. Receives NASDAQ Determination Letter," which announced that:

16

Swisher Hygiene Inc. ("Swisher Hygiene") (Nasdaq:SWSH) (TSX:SWI), a leading provider of essential hygiene and sanitation products and services, announced today that, on September 20, 2012, it notified The NASDAQ Stock Market("NASDAQ") that its Form 10-K for the year ended December 31, 2011 (the "Form 10-K") and Form 10-Qs for the quarterly periods ended March 31, 2012 and June 30, 2012 (together, the "Form 10-Qs") will not be filed with the Securities and Exchange Commission by September 26, 2012, which is the extended deadline for filing previously granted to Swisher Hygiene by NASDAQ.

As a result of this notification, on September 21, 2012, Swisher Hygiene received a letter from NASDAQ advising that it remains non-compliant with the requirements for continued listing under NASDAQ Listing Rule 5250(c)(1) due to Swisher Hygiene's failure to timely file the Form 10-K and the Form 10-Qs. The letter further indicates that Swisher Hygiene's common stock is subject to delisting from NASDAQ unless it requests a hearing before a NASDAQ Listing Qualifications Panel (the "Panel") within seven calendar days of receipt of the letter.

Swisher Hygiene intends to timely request a hearing before the Panel. Swisher Hygiene's request for a hearing will automatically stay any delisting action for a period of 15 days from the date of the request. In addition, in connection with its request for a hearing, Swisher Hygiene will request that the Panel continue the stay of delisting until the conclusion of the hearing process. Swisher Hygiene expects that a hearing will be set for 30 to 45 days from the date of the request and that the Panel will take approximately one to six weeks from the hearing date to render a decision. If Swisher Hygiene's plan to regain compliance is approved, the Panel may provide Swisher Hygiene up to 360 days from the original due date for the Form 10-K, which was March 30, 2012. However, Swisher Hygiene cannot provide assurance that the Panel will grant the company a stay of Staff's delisting determination until the conclusion of the hearing process or that it will grant Swisher Hygiene an exception for additional time to regain compliance with NASDAQ's filing requirement.

"We are disappointed that the review process remains ongoing and that we continue to be in non-compliance with NASDAQ," said Thomas Byrne, Interim President and Chief Executive Officer of Swisher Hygiene. "While the process remains ongoing, Swisher Hygiene continues to conduct its day-to-day business and remains dedicated to providing outstanding customer service."

Swisher Hygiene has been noted in default of the continuous disclosure requirements by the securities regulators in several provinces of Canada for certain failures stemming from the non-compliance described above, including the failure to timely file its annual financial statements for the year ended December 31, 2011 and related information, and for publicly acknowledging that certain of its previously filed financial statements may no longer be relied upon.

17

In connection with these defaults, Swisher Hygiene previously applied to the Ontario Securities Commission (the "OSC"), as its principal Canadian securities regulator, for a temporary order prohibiting its directors and officers from trading in the securities of Swisher Hygiene for as long as these defaults remain outstanding. If a management cease trade order is granted, it is not expected to affect the ability of persons who are not directors or officers of Swisher Hygiene to trade in the securities of Swisher Hygiene. In the absence of a management cease trade order, and in the event that the continuous disclosure defaults have not been remedied, the Canadian securities regulators may issue a general cease trade order against Swisher Hygiene. The shares of Swisher Hygiene's common stock trade on the Toronto Stock Exchange (the "TSX") under the symbol "SWI." However, the TSX has previously indicated that, if Swisher's non-compliance with the applicable filing requirements continues past September 2012, the TSX may conduct a formal delisting review in respect of Swisher.

50.     The Individual Defendants continued to be unable to bring the Company into compliance with NASDAQ's listing requirements. On December 12, 2012, the Company announced that "after meeting with the NASDAQ Hearings Panel to review its plan of compliance to complete its public filings, [NASDAQ] has granted Swisher Hygiene's request to remain listed on NASDAQ, subject to meeting specific conditions for continued listing," but on January 8, 2013, the Company revealed that "it received a NASDAQ Staff Determination Letter indicating that Swisher Hygiene's failure to hold its 2012 annual meeting of stockholders by December 31, 2012, as required by NASDAQ Listing Rule 5620, serves as an additional basis for delisting Swisher Hygiene's securities from The NASDAQ Stock Market."

51.     Finally on February 20, 2013, the Company issued a press release announcing Swisher's restated first, second, and third quarter results for 2011 would be filed with the SEC. The restated reports include the following highlights:

- Aggregate adjustments result in $4.8 million increase in net loss before income tax.

- Aggregate adjustments result in $1.9 million increase in net loss.

- Aggregate adjustments result in $0.01 increase in net loss per share.

18

52.     In addition, the February 20, 2013 press release announced that Thomas Byrne had been appointed President and CEO, and quoted Mr. Byrne as stating: "We are pleased to have completed the restatement process and will file our restated financial results for the first three quarters of 2011 by this afternoon with NASDAQ and the SEC. In addition, we continue to work nonstop toward finalizing our 2011 Annual Report on Form 10-K, including our audited financial statements, as well as toward filing our quarterly reports for the first three quarters of 2012 as quickly as possible in order to regain compliance with our NASDAQ listing requirements. We have notified NASDAQ of our intention to file our 10-K on Monday, February 25."

53.     The restated quarterly reports for 2011 showed that Swisher's previously reported revenues were materially overstated, and that Swisher had to adjust nearly every line item on its financial statements. Contrary to the Defendant Berrard's statements in March 2012 that "the adjustments that are being discussed are non-cash in nature and we strongly believe that they will not diminish our financial position or strong capital structure," adjustments were made to nearly every income category, including cash.

54.     The restated quarterly reports for 2011 also showed that in the uncorrected reports originally filed with the SEC, current expenses had been improperly recorded as shareholder's equity, which caused overstated earnings and understated expenses and losses. The restated quarterly reports for 2011 admitted that there were material weaknesses in the Company's internal controls, making the Company's statements to investors that Swisher had adequate internal controls materially false and misleading when made. The Individual Defendants breached their fiduciary duties by causing or allowing the Company to make these materially false and misleading statements.

55.     On February 26, 2013, the Company announced that it had filed its 10-K for the year ended December 31, 2011. As stated in the press release issued that day:

> "We are pleased to report results for the full year 2011 and officially put the year behind us as we continue to make progress in filing our outstanding financials,"

19

said Thomas Byrne, President and Chief Executive Officer of Swisher Hygiene. "We intend to file our quarterly reports for the first three quarters of 2012 shortly in order to regain compliance."

"In terms of our 2011 results, we achieved 28% revenue growth from hygiene company-owned operations when excluding acquisitions," continued Mr. Byrne. "Our costs were significant in 2011 as we completed a large number of acquisitions and had material initial public company costs; however, we started to institute cost initiatives in the latter part of 2011 that ultimately led to the implementation of over $10 million in cost reductions during 2012, and we are looking to achieve corresponding efficiencies during the current year. We remain dedicated to serving our customers nationwide on a day-to-day basis with our comprehensive core chemical program as well as our complementary hygiene and sanitation services."

56.     On March 11, 2013, the Company filed financial results on Form 10-Q with the SEC for the three-month period ended March 31, 2012. On March 15, 2013, the Company filed financial results on Form 10-Q with the SEC for the three-month period ended June 30, 2012. According to the accompanying press release issued March 15, 2013:

"Results during the second quarter of 2012 were materially affected by the investigation and review process, impacting our overall operations and contributing to significantly higher SG&A costs in the quarter," said Thomas Byrne, President and Chief Executive Officer of Swisher Hygiene. "Despite the ongoing review process, we continued to see improvement in our route expense as a percentage of revenue through our initial route consolidation initiatives and, excluding expenses related to the investigation and review, we reduced our SG&A expense as a percentage of revenue by 740 basis points. We remain dedicated to serving our customers nationwide on a day-to-day basis with our comprehensive core chemical program as well as our complementary hygiene and sanitizing services."

"We are nearing the end of filing our outstanding financials, with only one more 2012 Form 10-Q remaining," continued Mr. Byrne. "We aim to complete the filing of our third quarter 2012 Form 10-Q within the next few days, which will position us to file our 2012 Form 10-K during the month of April."

57.     On March 18, 2013, the Company filed financial results on Form 10-Q with the SEC for the three-month period ended September 30, 2012. On May 1, 2013, the Company

finally filed Form 10-K with the SEC for the fourth quarter and full year 2012. According to the press release issued the same day:

> "With today's release and the filing of our 10-K, we will have completed the restatement process and our 2012 public reporting obligations," said Thomas Byrne, President and Chief Executive Officer of Swisher Hygiene. "We again thank our shareholders for their patience and continued support over the past year."

> "Our fourth quarter 2012 results were affected by the investigation and review process that was completed in February 2013, which impacted our top line growth and bottom line results," continued Mr. Byrne. "As a result of the overall process, we lost a couple of large accounts, from which we will continue to see effects in the first half of 2013. However, we are encouraged by the renewed interest we have seen in our corporate account and distributor programs during the first quarter of 2013, and we will continue to expand our field cross-selling programs while emphasizing customer service, retention and new customer acquisition. Additionally, we continue to simplify and standardize operations, which is enhancing our customer service and allowing us to further eliminate costs and improve cash flow."

58.     The Company's stock price has continued to decline since the misconduct was first revealed in March 2012, in part because of the long delay during which the Individual Defendants failed to file corrected 2011 financial reports for the Company.

59.     The Individual Defendants' illegal actions and course of conduct have subjected Swisher to multiple class action lawsuits for violations of the federal securities laws, which were consolidated as multidistrict litigation in the district court for the Western District of North Carolina on August 13, 2012, under case number MDL-02384. As a result, Swisher has expended, and will continue to expend, significant sums of money to defend the Company in the litigation.

60.     On June 12, 2013, the Company announced that it was back in compliance with NASDAQ, and the stock price rose 3% on the news, but those gains were quickly reversed. By June 20, 2013, the share price had declined to $0.75 per share, a loss of over 75% of the value of Swisher shares before the announcement of the misconduct.

21

61. Due to the ongoing breaches of fiduciary duty by the Individual Defendants, Plaintiff brings this shareholder derivative action (i) to recover for the Company those losses caused by the Individual Defendants' breaches of fiduciary duties, gross mismanagement, abuse of control, waste of corporate assets, and aiding and abetting thereof; (ii) to seek reforms to the Company's corporate governance designed to prevent these actions in the future; and (iii) because the Company's Board has refused to take any corrective action despite Plaintiff's demand.

## V.   DUTIES OF THE INDIVIDUAL DEFENDANTS

### A.   Fiduciary Duties

62. By reason of their positions as officers, directors, and/or fiduciaries of Swisher and because of their ability to control the business and corporate affairs of Swisher, the Individual Defendants owed and owe the Company and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Swisher in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Swisher and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

63. Each director and officer of the Company owes to Swisher and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing. In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's operations, performance, management, projections, and forecasts so that the market price of the Company's stock would be based on truthful and accurate information.

22

**B.    Control, Access, And Authority**

64.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of Swisher, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Swisher.

65.    Because of their advisory, executive, managerial, and directorial positions with Swisher, each of the Individual Defendants had access to adverse, non-public information about the financial condition, operations, and improper representations of Swisher.

66.    At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Swisher, and was at all times acting within the course and scope of such agency.

**C.    Reasonable And Prudent Supervision**

67.    To discharge their duties, the officers and directors of Swisher were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the financial affairs of the Company.  By virtue of such duties, the officers and directors of Swisher were required to, among other things:

(a)    refrain from acting upon material inside corporate information to benefit themselves;

(b)    ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the investing public;

(c)    conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(d)    properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results;

23

(e)     remain informed as to how Swisher conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with securities laws; and

(f)     ensure that Swisher was operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules, and regulations.

## VI.     BREACHES OF DUTIES

68.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to Swisher and to its shareholders the fiduciary duty of loyalty and good faith and the exercise of due care and diligence in the management and administration of the affairs of Swisher, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Swisher, the absence of good faith on their part, and a reckless disregard for their duties to Swisher and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to Swisher.

69.     The Individual Defendants each breached their duty of loyalty and good faith by allowing Defendants to cause, or by themselves causing, the Company to make false and/or misleading statements that misled shareholders into believing that the Company's business acquisitions were being properly accounted for and that the Company had adequate internal controls. In addition, as a result of the Individual Defendants' illegal actions and course of conduct, the Company is now the subject of a class action lawsuit that alleges violations of the federal securities laws. As a result, Swisher has expended, and will continue to expend, significant sums of money to rectify Defendants' wrongdoing.

## VII.     CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

70.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with

24

and conspired with one another in furtherance of their wrongdoing. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

71. During all times relevant hereto, the Individual Defendants collectively and individually initiated a course of conduct that was designed to overstate the Company's income and mislead shareholders into believing that the Company's aggressive business acquisitions were producing positive financial results. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.

72. The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (a) disguise the Individual Defendants' violations of law, including breaches of fiduciary duty and unjust enrichment; and (b) disguise and misrepresent the Company's future business prospects.

73. The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully, recklessly, or negligently release improper statements. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

74. Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commissions of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## VIII. DAMAGES TO THE COMPANY

75. As a result of the Individual Defendants' wrongful conduct, Swisher disseminated false and misleading statements. The improper statements have devastated Swisher's

credibility. Additionally, Swisher is now the subject of a securities fraud class action lawsuit. The Company will face substantial costs in connection with an investigation and the lawsuit.

76. As a direct and proximate result of the Individual Defendants' actions as alleged above, Swisher's market capitalization has been substantially damaged.

77. Further, as a direct and proximate result of the Individual Defendants' conduct, Swisher has expended and will continue to expend significant sums of money. Such expenditures include, but are not limited to:

(a) costs incurred in investigating and defending Swisher and certain officers in a class action lawsuit, plus potentially hundreds of millions of dollars in settlement or to satisfy an adverse judgment;

(b) costs incurred from compensation and benefits paid to the Individual Defendants, which compensation was based at least in part on Swisher artificially-inflated stock price and inflated revenues; and

(c) costs incurred from the loss of the Company's customers' confidence in Swisher services.

78. Moreover, these actions have irreparably damaged Swisher's corporate image and goodwill. For at least the foreseeable future, Swisher will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that Swisher's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## IX. DERIVATIVE AND DEMAND ALLEGATIONS

79. Plaintiff brings this action derivatively in the right and for the benefit of Swisher to redress injuries suffered, and to be suffered, by Swisher as a direct result of the Individual Defendants' breaches of fiduciary duty and unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants. Swisher is named as a nominal defendant solely in a derivative capacity.

26

80.     Plaintiff is a current owner of common shares of Swisher's stock and has been an owner of Swisher's stock for all times relevant to this complaint.

81.     Plaintiff will fairly and adequately represent the interests of Swisher in enforcing the rights of the Company in this action.

82.     On April 11, 2012, Plaintiff made a demand (the "Demand") on the Board under Delaware Chancery Court Rule 23.1 to investigate and address the misconduct, and, if warranted, to commence litigation against the Individual Defendants. A true and correct copy of the Demand is attached as Exhibit A.

83.     On April 23, 2012, counsel for the Company replied to the Demand and informed Plaintiff that the Demand had been forwarded to the Board, and that, assuming that Plaintiff was able to establish his share ownership during the relevant time period, the Board would consider the Demand and respond within a reasonable time. A true and correct copy of the April 23, 2012 letter is attached as Exhibit B.

84.     On May 16, 2013, counsel for the Company replied to the Demand and informed Plaintiff that the Board had considered the Demand and had determined that it was not in the best interests of Swisher to pursue the claims outlined in the Demand (the "Demand Refusal"). A true and correct copy of the Demand Refusal is attached as Exhibit C.

85.     The Board's refusal of the demand was unreasonable and the Individual Defendants failed to act in good faith, on an informed basis, or in the honest belief that the refusal was in the best interest of the Company.

86.     Under Delaware law, when a corporation receives a demand letter requesting that suitable action be taken against officers or directors of a corporation, the corporation's board of directors is authorized to establish a special committee of independent directors to determine, after conducting a reasonable inquiry, whether maintenance of a derivative proceeding is in the corporation's best interest. The special committee, or the Board, must provide a reasonable record to show that it has fairly evaluated the facts and legal claims that a derivative plaintiff raises.

27

87.     The Demand Refusal does not indicate that the Board established a special committee to conduct a reasonable inquiry into whether the Demand was in Swisher's best interest.   The Demand Refusal states that the Board "considered the Demand and, after consultation with special counsel, determined that it is not in the best interests of Swisher to pursue the claims outlined in the Demand."

88.     Although the Demand Refusal states that the Board considered numerous factors, including the pending consolidated securities class and derivative action filed in federal court and the therapeutic changes that Swisher has already implemented, the Demand Refusal gives no indication that the Board was sufficiently independent and disinterested so as to conduct an adequate and reasonable investigation of the Demand, or that the investigation was conducted in good faith or on an informed basis which included an evaluation of all relevant facts and legal claims.   The Demand Refusal also did not provide a copy of any report on the results of the investigation, or indicate whether such a report had been prepared.

89.     Prior to June 2013, the Board consisted of nine directors, Defendants Berrard, Braley, Bush, Hudson, Huizenga, Pruitt, Prussky, Serruya and Handley.   In June 2013, Defendants Huizenga, Bush and Braley did not stand for re-election, and non-defendant William M. Pierce joined the Board, bringing the number of members to seven.   Mr. Pierce, a Senior Vice President at Huizenga Holdings, Inc., has held financial and operating positions at various companies in which Defendant Huizenga has invested.

90.     Defendant Berrard is incapable of independently and disinterestedly considering the Demand.   Berrard has been named as a defendant in the consolidated securities class action lawsuit against the Company.   Berrard was President and CEO of the Company until August 2012 when he stepped down as the Company investigated the misconduct.   Despite his role in the misconduct, Berrard remained as a director.   Berrard knowingly signed and disseminated the false and misleading financial statements issued by the Company and filed with the SEC, and faces a substantial likelihood of liability for breaching his fiduciary duties.   Defendant Berrard also made numerous false and misleading statements, as set forth above, in press releases issued

28

by the Company. As of the most recent Form 10-K filed by the Company, as of April 2013, Berrard owns over 25 million shares of Swisher stock, which is 14.3% of the Company's outstanding shares.

91.     Defendant Berrard is also incapable of independently and disinterestedly considering the Demand because of his close relationship with Defendant Huizenga, which continues to the present. Throughout most of the 1980's, Berrard served as president of Huizenga Holdings, Inc. ("Huizenga Holdings"), as well as in positions with subsidiaries of Huizenga Holdings. Berrard has also held positions as officer or director of other Defendant Huizenga acquisitions, including Blockbuster Entertainment Group and AutoNation, Inc. Defendants Berrard and Huizenga first invested in Swisher in 2004, and embarked on their usual "roll-up" strategy with Swisher, implementing their plan to rapidly acquire competing smaller companies. Berrard knowingly joined in this scheme while aware that the Company lacked appropriate internal controls, and his actions were not and could not have been the product of a good faith exercise of business judgment. Further, Berrard lacked independence and good faith to consider the Demand because of his reliance on his relationship with Defendant Huizenga for his continued employment.

92.     Defendant Braley was incapable of independently and disinterestedly considering the Demand. Braley stepped down as a director in June 2013, after the Demand was improperly refused. Defendant Braley's lack of independence and disinterest was confirmed by Defendant Huizenga in May 2013, who stated, "I want to thank David [Defendant Braley] and Jeb [Defendant Bush] for being such vital and committed members of the Board, and for providing their support to the Board through the audit and restatement process despite their extremely busy schedules." Braley knowingly allowed the Company to issue and disseminate false and misleading financial statements that were filed with the SEC, and his actions were not and could not have been the product of a good faith exercise of business judgment. To implement Defendant Huizenga's growth strategy, Braley knowingly allowed the Company to issue and disseminate false and misleading financial statements while aware that the Company lacked

29

appropriate internal controls, and faces a substantial likelihood of liability for breaching his fiduciary duties. Braley lacked independence and good faith to consider the Demand because instead of exercising his independent judgment to consider the facts, he supported the Board through the audit and restatement process to protect his own interests and those of the other Individual Defendants.

93.     Defendant Bush was incapable of independently and disinterestedly considering the Demand. Bush stepped down as a director in June 2013, after the Demand was improperly refused. Defendant Bush's lack of independence and disinterest was confirmed by Defendant Huizenga in May 2013, who stated, "I want to thank David [Defendant Braley] and Jeb [Defendant Bush] for being such vital and committed members of the Board, and for providing their support to the Board through the audit and restatement process despite their extremely busy schedules." Bush knowingly allowed the Company to issue and disseminate false and misleading financial statements that were filed with the SEC, and his actions were not and could not have been the product of a good faith exercise of business judgment. To implement Defendant Huizenga's growth strategy, Bush knowingly allowed the Company to issue and disseminate false and misleading financial statements while aware that the Company lacked appropriate internal controls, and faces a substantial likelihood of liability for breaching his fiduciary duties. Bush lacked independence and good faith to consider the Demand because instead of exercising his independent judgment to consider the facts, he supported the Board through the audit and restatement process to protect his own interests and those of the other Individual Defendants.

94.     Defendant Handley was incapable of independently and disinterestedly considering the Demand. Handley joined the Board in December 2012 and is the senior vice president and general counsel of Huizenga Holdings, a private investment conglomerate in Fort Lauderdale which owns real estate, marinas, and marina-related companies, and which was founded by Defendant Huizenga. Handley knowingly allowed the Company to issue and disseminate false and misleading financial statements that were filed with the SEC, and his

30

actions were not and could not have been the product of a good faith exercise of business judgment. To implement Defendant Huizenga's growth strategy, Handley knowingly allowed the Company to issue and disseminate false and misleading financial statements while aware that the Company lacked appropriate internal controls, and faces a substantial likelihood of liability for breaching his fiduciary duties. Handley lacked independence and good faith to consider the Demand because instead of exercising his independent judgment to consider the facts, he was brought onto the Board to further represent Defendant Huizenga's interests, and supported the Board through the audit and restatement process to protect his own interests and those of the other Individual Defendants.

95. Defendant Hudson was incapable of independently and disinterestedly considering the Demand. Hudson joined the Board in January 2011, and a press release issued by the Company confirmed that Hudson was chosen for the Board after two previous directors tendered their resignations in light of potential growth strategies currently under consideration by Swisher. Defendant Berrard stated in the January 2011 press release: "We are delighted that Mr. Hudson and Mr. Pruitt have joined our Board. Their experience working with growth companies will be a great asset to our Board as we continue to execute on our organic and acquisition growth strategies." Hudson knowingly allowed the Company to issue and disseminate false and misleading financial statements that were filed with the SEC, and his actions were not and could not have been the product of a good faith exercise of business judgment. To implement Defendant Huizenga's growth strategy, Hudson knowingly allowed the Company to issue and disseminate false and misleading financial statements while aware that the Company lacked appropriate internal controls, and faces a substantial likelihood of liability for breaching his fiduciary duties. Hudson lacked independence and good faith to consider the Demand because instead of exercising his independent judgment to consider the facts, he supported the Board through the audit and restatement process to protect his own interests and those of the other Individual Defendants.

96.     Defendant Huizenga was incapable of independently and disinterestedly considering the Demand. Huizenga stepped down as a Chairman of the Board in June 2013, after the Demand was improperly refused. As of the most recent Form 10-K filed by the Company, as of April 2013, Huizenga owns over 24 million shares of Swisher stock, which is 13.8% of the Company's outstanding shares. Further, Defendant Berrard and two other Company executives have pledged their stock, a total of 27.85 million additional shares, to Huizenga as security for certain obligations owing pursuant to stock pledge and security agreements by each executive officer and director for the benefit of Huizenga. Huizenga knowingly allowed the Company to issue and disseminate false and misleading financial statements that were filed with the SEC, and his actions were not and could not have been the product of a good faith exercise of business judgment. To implement his own growth strategy, Huizenga knowingly allowed the Company to issue and disseminate false and misleading financial statements while aware that the Company lacked appropriate internal controls, and faces a substantial likelihood of liability for breaching his fiduciary duties.

97.     Defendant Huizenga is also incapable of independently and disinterestedly considering the Demand because of his position as the driving force behind Swisher. Defendant Huizenga first invested in Swisher in 2004, and embarked on his usual "roll-up" strategy with Swisher, implementing his plan to rapidly acquire competing smaller companies in accordance with similar schemes he had used to build other companies. Huizenga knowingly implemented this scheme while aware that the Company lacked appropriate internal controls, and his actions were not and could not have been the product of a good faith exercise of business judgment. Huizenga lacked independence and good faith to consider the Demand because he controlled the Board as support his own interests, and selected directors who would support and implement his business strategies.

98.     Defendant Pruitt was incapable of independently and disinterestedly considering the Demand. Pruitt joined the Board in January 2011, and a press release issued by the Company confirmed that Pruitt was chosen for the Board after two previous directors tendered their

32

resignations in light of potential growth strategies currently under consideration by Swisher. Defendant Berrard stated in the January 2011 press release: "We are delighted that Mr. Hudson and Mr. Pruitt have joined our Board. Their experience working with growth companies will be a great asset to our Board as we continue to execute on our organic and acquisition growth strategies." Pruitt knowingly allowed the Company to issue and disseminate false and misleading financial statements that were filed with the SEC, and his actions were not and could not have been the product of a good faith exercise of business judgment. To implement Defendant Huizenga's growth strategy, Pruitt knowingly allowed the Company to issue and disseminate false and misleading financial statements while aware that the Company lacked appropriate internal controls, and faces a substantial likelihood of liability for breaching his fiduciary duties. Pruitt lacked independence and good faith to consider the Demand because instead of exercising his independent judgment to consider the facts, he supported the Board through the audit and restatement process to protect his own interests and those of the other Individual Defendants.

99. Defendant Prussky was incapable of independently and disinterestedly considering the Demand. Prussky knowingly allowed the Company to issue and disseminate false and misleading financial statements that were filed with the SEC, and his actions were not and could not have been the product of a good faith exercise of business judgment. To implement Defendant Huizenga's growth strategy, Prussky knowingly allowed the Company to issue and disseminate false and misleading financial statements while aware that the Company lacked appropriate internal controls, and faces a substantial likelihood of liability for breaching his fiduciary duties. Prussky lacked independence and good faith to consider the Demand because instead of exercising his independent judgment to consider the facts, he supported the Board through the audit and restatement process to protect his own interests and those of the other Individual Defendants.

100. Defendant Serruya was incapable of independently and disinterestedly considering the Demand. Serruya knowingly allowed the Company to issue and disseminate false and misleading financial statements that were filed with the SEC, and his actions were not

and could not have been the product of a good faith exercise of business judgment. To implement Defendant Huizenga's growth strategy, Serruya knowingly allowed the Company to issue and disseminate false and misleading financial statements while aware that the Company lacked appropriate internal controls, and faces a substantial likelihood of liability for breaching his fiduciary duties. Serruya lacked independence and good faith to consider the Demand because instead of exercising his independent judgment to consider the facts, he supported the Board through the audit and restatement process to protect his own interests and those of the other Individual Defendants.

101.    Because Plaintiff's Demand has been wrongfully refused by the Board, Plaintiff now therefore brings this action to redress injuries suffered, and to be suffered, by Swisher as a direct result of breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, and aiding and abetting thereof, by the Individual Defendants. Swisher is named as a nominal defendant solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

## COUNT I

### Against The Individual Defendants For Breach Of Fiduciary Duty

102.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

103.    Each of the Individual Defendants owed and owe Swisher fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed and owe Swisher the highest obligation of good faith, fair dealing, loyalty, due care, reasonable inquiry, oversight and supervision.

104.    Each of the Individual Defendants violated and breached their fiduciary duties of good faith, fair dealing, loyalty, due care, reasonable inquiry, oversight and supervision.

34

105.    The Individual Defendants each knowingly, recklessly, or negligently approved the issuance of false statements that misrepresented and failed to disclose material information concerning the Company. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

106.    As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, Swisher has sustained significant damages. As a result of the misconduct alleged herein, each of the Individual Defendants are liable to the Company.

107.    Plaintiff, on behalf of Swisher, has no adequate remedy at law.

## COUNT II

### Against the Individual Defendants For Gross Mismanagement

108.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

109.    The Individual Defendants had a duty to Swisher and its shareholders to competently and lawfully supervise, manage and control the operations, business, and internal financial accounting and disclosures of the Company. By engaging in the wrongdoing alleged herein, the Individual Defendants abandoned and abdicated their responsibilities with regard to prudently and reasonably managing the business of Swisher consistent with the duties imposed upon them by law, and breached their duties of due care, diligence and candor in the management and administration of Swisher's business and the use and preservation of the Company's assets.

110.    Although the Individual Defendants were aware of the unreasonable risks and losses associated with their misconduct, each of the Individual Defendants caused Swisher to engage in the scheme described herein, which they knew had an unreasonable risk of damage to

35

the Company, thus breaching their duties to the Company and its shareholders. As a result of their misconduct, the Individual Defendants grossly mismanaged Swisher and caused damage to the Company.

## COUNT III

### Against the Individual Defendants For Abuse of Control

111. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

112. At all relevant times, the Individual Defendants employed an unlawful scheme for the purpose of maintaining and entrenching themselves in their positions of control, power, prestige and profit at Swisher. As a part of this scheme, each of the Individual Defendants made, caused to be made, and/or participated in the making of misrepresentations regarding Swisher's financial condition and business prospects

113. The Individual Defendants' misconduct, as alleged herein, constituted an abuse of their control over Swisher.

114. As a direct and proximate result of the Individual Defendants' actions described herein, the Company has suffered significant damages, as alleged herein.

115. Plaintiff, on behalf of Swisher, has no adequate remedy at law.

## COUNT IV

### Against the Individual Defendants for Waste of Corporate Assets

116. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

117. Each of the Individual Defendants wasted corporate assets by paying improper compensation and bonuses to the executive officers and directors that breached their fiduciary duty, exposing the Company to liability, and causing it to incur potentially millions of dollars in legal costs. All the payments and benefits provided to the Individual Defendants were at the expense of Swisher, and the Company received no benefit from these payments.

118. As a result of the Individual Defendants' waste of corporate assets, the Individual Defendants are liable to the Company.

119. As a direct and proximate result of the Individual Defendants' actions described herein, the Company has suffered significant damages, as alleged herein.

120. Plaintiff, on behalf of Swisher, has no adequate remedy at law.

**COUNT V**

**Against the Individual Defendants For Aiding and Abetting Fiduciary Violations**

121. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

122. The wrongful conduct alleged herein was continuous, connected, and on-going during the relevant period. The Individual Defendants' misconduct resulted in continuous, connected, and on-going harm to the Company.

123. Each of the Individual Defendants had the power and/or ability to, and did, directly or indirectly control or influence the Company's general affairs, including the content of public statements disseminated by Swisher, and had the power and/or ability directly or indirectly to control or influence one another.

124. Each of the Individual Defendants is jointly and severally liable to the same extent as any defendant is liable for breaches of fiduciary duty as set forth herein or violations of any other laws.

125. As a direct and proximate result of the Individual Defendants' foregoing breaches of fiduciary duties, the Company has suffered significant damages, as alleged herein.

126. Plaintiff, on behalf of Swisher, has no adequate remedy at law.

**X.   PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment as follows:

A. Against all the Individual Defendants for the amount of damages sustained by the Company as a result of the Individual Defendants' violations of federal securities laws, breaches of fiduciary duties, aiding and abetting breaches of fiduciary duty, and unjust enrichment;

37

B.    Directing Swisher to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Swisher and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote the following Corporate Governance Policies:

- a provision to control and limit insider stock selling based on non public information;

- a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

- a provision to permit the shareholders of Swisher to nominate at least two candidates for election to the Board;

- a proposal to ensure the accuracy of the qualifications of Swisher's directors, executives and other employees;

- a proposal to strengthen the Company's procedures for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal controls and auditing matters; and

- a provision to appropriately test and then strengthen the internal audit and control functions;

C.    Awarding to Swisher restitution from the Individual Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by the Individual Defendants;

D.    Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.    Granting such other and further relief as the Court deems just and proper.

38

## XI.     JURY DEMAND

Plaintiff demands a trial by jury.

This the 11th day of July, 2013.

NORRIS A. ADAMS, II
N.C. State Bar No. 32552
nadams@essexrichards.com
MARC E. GUSTAFSON
mgustafson@essexrichards.com
N.C. State Bar No. 34439
ESSEX RICHARDS, P.A.
1701 South Blvd.
Charlotte, NC 28203
Telephone: 704-377-4300
Facsimile: 704-372-1357

JOHNSON & WEAVER, LLP
Frank J. Johnson
Brett M. Weaver
Cecilia E. Rutherford
110 West "A" Street, Suite 750
San Diego, CA 92101
Telephone: (619) 230-0063
Facsimile: (619)255-1856

*Attorneys for Plaintiff*

39

## VERIFICATION

I, Tom Borthwick, hereby verify that I am a shareholder of Swisher Hygiene, Inc. (the "Company"), and am ready, willing, and able to pursue this action in the hope of improving the Company and recovering damages for the Company caused by the defendants' conduct. I have reviewed the allegations made in this Verified Shareholder Derivative Complaint ("Complaint") and to those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true. Having received a copy of this Complaint, having reviewed it with my counsel, I hereby authorize its filing.

Date: _____                         _____

                                                      Tom Borthwick